## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT   [ ] INFORMATION   [ ] INDICTMENT   [ ] SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 18 U.S.C. §§ 1951(a) and 2 – Robbery Affecting Interstate Commerce

[ ] Petty
[ ] Minor
[ ] Misde-meanor
[X] Felony

PENALTY:   Maximum Term of Imprisonment: 20 years
Maximum Term of Supervised Release: 3 years
Maximum Fine: $250,000
Mandatory $100 special assessment
Forfeiture and restitution

**DEFENDANT - U.S**

Afatupetaiki Faasisila

DISTRICT COURT NUMBER

4:25-mj-71456 MAG

### PROCEEDING

**Name of Complainant Agency, or Person (& Title, if any)**

Federal Bureau of Investigation

[X] person is awaiting trial in another Federal or State Court, give name of court

Alameda County Superior Court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:

[ ] U.S. ATTORNEY   [ ] DEFENSE

SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

**Name and Office of Person Furnishing Information on this form**   Craig H. Missakian

[X] U.S. Attorney   [ ] Other U.S. Agency

**Name of Assistant U.S. Attorney (if assigned)**   AUSAs Heffron and Garbers

### DEFENDANT

**IS *NOT* IN CUSTODY**

Has not been arrested, pending outcome this proceeding.
1) [X] If not detained give date any prior summons was served on above charges ▸ _____

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) [ ] On this charge

5) [ ] On another conviction

   [ ] Federal   [ ] State

6) [ ] Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   [ ] Yes   [ ] No   If "Yes" give date filed _____

**DATE OF ARREST** ▸   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▸   Month/Day/Year

**FILED**

Dec 08 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

[ ] This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

[ ] SUMMONS   [ ] NO PROCESS*   [X] WARRANT    Bail Amount: No Bail

If Summons, complete following:
[ ] Arraignment   [ ] Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____    Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT

☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 18 U.S.C. §§ 1951(a) and 2 – Robbery Affecting Interstate Commerce

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum Term of Imprisonment: 20 years
Maximum Term of Supervised Release: 3 years
Maximum Fine: $250,000
Mandatory $100 special assessment
Forfeiture and restitution

### DEFENDANT - U.S

▶ Jose Herrada-Aragon

DISTRICT COURT NUMBER

4:25-mj-71456 MAG

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☒ person is awaiting trial in another Federal or State Court, give name of court

Alameda County Superior Court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person Furnishing Information on this form   Craig H. Missakian

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   AUSAs Heffron and Garbers

### DEFENDANT

**IS *NOT* IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding.
If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☒ On another conviction

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

FILED

Dec 08 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ Federal   ☒ State

Has detainer been filed?   ☐ Yes   ☒ No
} If "Yes" give date filed

**DATE OF ARREST** ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶   Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:   Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT

☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 18 U.S.C. §§ 1951(a) and 2 – Robbery Affecting Interstate Commerce

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  Maximum Term of Imprisonment: 20 years
Maximum Term of Supervised Release: 3 years
Maximum Fine: $250,000
Mandatory $100 special assessment
Forfeiture and restitution

### DEFENDANT - U.S

▶ Andres Palestino

DISTRICT COURT NUMBER

4:25-mj-71456 MAG

### DEFENDANT

**IS _NOT_ IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☒ person is awaiting trial in another Federal or State Court, give name of court

Alameda County Superior Court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

_____

Name and Office of Person Furnishing Information on this form   Craig H. Missakian

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   AUSAs Heffron and Garbers

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction     } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes   } If "Yes" give date filed
been filed?    ☐ No

**DATE OF ARREST** ▶         Month/Day/Year

_____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year

_____

FILED

Dec 08 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT     Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

_____

Date/Time: _____   Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 18 U.S.C. §§ 1951(a) and 2 – Robbery Affecting Interstate Commerce

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum Term of Imprisonment: 20 years
Maximum Term of Supervised Release: 3 years
Maximum Fine: $250,000
Mandatory $100 special assessment
Forfeiture and restitution

### DEFENDANT - U.S

▶ Tom Parker Donegan

DISTRICT COURT NUMBER

4:25-mj-71456 MAG

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☒ person is awaiting trial in another Federal or State Court, give name of court

Alameda Co. Sup. Court; Santa Clara Co. Sup. Court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:    SHOW DOCKET NO.
    ☐ U.S. ATTORNEY  ☐ DEFENSE  }

☐ this prosecution relates to a pending case involving this same defendant    MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under  }

Name and Office of Person Furnishing Information on this form    Craig H. Missakian

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    AUSAs Heffron and Garbers

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction    } ☐ Federal ☐ State

6) ☒ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution
Santa Clara County Jail (Elmwood)

Has detainer been filed?  ☐ Yes    } If "Yes" give date filed _____
                          ☒ No

**DATE OF ARREST** ▶    Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year _____

**FILED**

Dec 08 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT    Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

_____

Date/Time: _____    Before Judge: _____

Comments:

AO 91 (Rev. 11/11)    Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Afatupetaiki Faasisila, Jose Herrada-Aragon, | ) |
| Andres Palestino, and Tom Parker Donegan | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

Case No.    4:25-mj-71456 MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 18, 2025_____ in the county of _____Alameda_____ in the
_____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1951(a) and 2 | Robbery Affecting Interstate Commerce |

> **FILED**
>
> Dec 08 2025
>
> Mark B. Busby
> CLERK, U.S. DISTRICT COURT
> NORTHERN DISTRICT OF CALIFORNIA
> OAKLAND

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Jason Brissey

Approved as to form    _/s/ Sloan Heffron_
                    AUSA Sloan Heffron

☑ Continued on the attached sheet.

_____
Complainant's signature

Jason Brissey, FBI Special Agent
_____
Printed name and title

Sworn to by the complainant over the telephone
in accordance with Fed.R.Crim.P. 4.1 and 4(d).

Date:    _____12/08/2025_____

_____
Judge's signature

City and state:    _____McKinleyville, California_____        Hon. Robert M. Illman, U.S. Magistrate Judge
                                                    _____
                                                    Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Jason Brissey, having been duly sworn, hereby declare and state as follows:

### INTRODUCTION

1.      I make this Affidavit in support of a Criminal Complaint against, and Arrest Warrants for, Afatupetaiki FAASISILA ("FAASISILA"), Jose HERRADA-ARAGON ("HERRADA-ARAGON"), Andres PALESTINO ("PALESTINO"), and Tom Parker DONEGAN ("DONEGAN") for violating 18 U.S.C. §§ 1951(a) and 2 – Robbery Affecting Interstate Commerce.  As set forth below, there is probable cause to believe that on or about June 18, 2025, in the Northern District of California, FAASISILA, HERRADA-ARAGON, PALESTINO, and DONEGAN, each aided and abetted by the other, knowingly obtained property from Kumar Jewelers in Fremont, California, by means of robbery affecting interstate commerce.

2.      The facts set forth in this Affidavit are based on my own personal knowledge, my review of reports, surveillance videos, photographs, and other records related to this investigation, information obtained from law enforcement agents, investigators, or other individuals with knowledge of this investigation, and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the Criminal Complaint and Arrest Warrants, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.  Unless otherwise noted, where this Affidavit describes information learned from other sources, such information is recounted in sum and substance.  As this investigation progresses, my understanding of the significance of certain facts and events may evolve.

### AGENT BACKGROUND

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2006.  I graduated from the 18-week FBI Academy in Quantico, Virginia in July 2006.  There, I received instruction on various aspects of federal investigations, including training related to the investigation of Hobbs Act Robbery and other offenses set forth

1

at 18 U.S.C. § 1951. This instruction also covered the investigation of additional crimes, including firearms offenses, drug trafficking, organized crime, and other violent crimes. I have received additional training in each of these areas throughout my employment with the FBI.

4.      I am currently assigned to a squad that investigates violent crime in the Bay Area, with an emphasis in Alameda County. In this assignment, I have participated in investigations of various crimes, including robberies, homicides, murders for hire, racketeering, shootings, firearms violations, drug trafficking, and human trafficking. I have authored and participated in the execution of numerous search warrants related to violent crime investigations. I have also spoken with, worked with, and gained knowledge from experienced federal, state, and local law enforcement officials concerning violent crime investigations.

5.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses enumerated in 18 U.S.C. § 2516, including violations of 18 U.S.C. § 1951.

### APPLICABLE LAW

6.      Under 18 U.S.C. § 1951 it is unlawful for a person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a).

7.      The statute defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

2

8.      The statute defines "commerce" as "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."  18 U.S.C. § 1951(b)(3).

9.      Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2(a).

<u>FACTS SUPPORTING PROBABLE CAUSE</u>

**Overview of June 18, 2025 Robbery of Kumar Jewelers**

10.      On Wednesday, June 18, 2025, around 5:28 p.m., a group of approximately 25+ masked persons conducted a takeover-style robbery at Kumar Jewelers, located on the 5100 block of Mowry Avenue in Fremont, California.  Surveillance video captured a gray Honda Accord sedan (the "Gray Honda Accord") ramming into the store's front entrance to force entry. A store security guard who was outside next to the entrance had to move out of the way to avoid being struck by the car.  A surveillance image of the Gray Honda Accord ramming into the store is below.  The image has been redacted to obscure certain license plate information.



11.    Around this time, approximately eight other vehicles pulled into the parking lot area outside the store's entrance.  Dozens of individuals (collectively, the "suspects") then exited the cars, approached the store's entrance on foot, and proceeded inside.  In the surveillance video, each suspect appeared to be wearing a face mask, a hooded sweatshirt or hooded jacket, long pants, and gloves.  Some were carrying backpacks or duffel bags, and some were carrying tools, including one suspect armed with a sledgehammer.  A surveillance image of several suspects approaching the store's entrance is below.  The image has been redacted to obscure certain license plate information.



12.    At the time of the collision, the jewelry store's owner ("RV-1") was in the back of the store.  His wife ("RV-2"), a female store employee ("PS"), and a female customer were in the showroom at the front of the store.  Following the collision, RV-2 realized the store was being robbed and feared for her safety.  The three women ran to the back of the store and called 911.  A redacted surveillance image of two of the women running from the showroom to the back of the store is at the top of the next page.



13.    Once inside the store, suspects used hammers and other tools to smash display cases to access the jewelry contained within.  Surveillance cameras inside the store captured suspects targeting glass counter display cases, wall mounted displays, and locked cases throughout the showroom, as shown in the below surveillance image.



14.     Approximately two minutes after the Gray Honda Accord first rammed the store's entrance, the suspects had ransacked the showroom and returned to the parking lot.  There, they entered into waiting vehicles which then fled the area.  The Gray Honda Accord used to ram the store's entrance was abandoned at the scene.  Police later inspected the car, which they determined was displaying a license plate taken from a different vehicle.  A records check revealed that the Gray Honda Accord had been reported stolen out of Oakland on June 12, 2025.

15.     As discussed below, police later interviewed the store owner and other employees present at the time of the robbery.  When interviewed shortly after the robbery, the owner ("RV-1") estimated that approximately 75-80% of the store's inventory was stolen during the robbery, resulting in an estimated loss of appoximately $1.7 million dollars' worth of jewelry.

**Vehicle Pursuit and Subsequent Apprehensions**

16.     Around 5:18 p.m., approximately ten minutes before the robbery began, Fremont Police Department ("Fremont PD") Dispatch received a report of suspicious vehicles near Planet Fitness, which is also located on the 5100 block of Mowry Avenue and shares a parking lot with Kumar Jewelers.  At approximately 5:28 p.m., Detective Jason Valdes called one of the reporting parties while simultaneously monitoring community surveillance cameras in the area.  The reporting party told Detective Valdes that there was a loud "boom" followed by people screaming at Kumar Jewelers.

17.     While monitoring the community surveillance cameras, Detective Valdes observed multiple suspect vehicles fleeing the area of Kumar Jewelers.  He reported his observations to responding officers and directed them to the suspect vehicles.

18.     At the time of the robbery, Officer Thomas Latimer was driving a marked patrol car on Mowry Avenue, toward the area of the shopping center in which Kumar Jewelers is located.  Upon learning that a loud bang and screams were reported coming from the jewelry store, Officer Latimer activated his siren and overhead lights.  He was advised that suspect

vehicles were fleeing from the shopping center, driving north on Farwell Drive toward Mowry Avenue. Officer Latimer then saw five vehicles driving in the northwest direction on Farwell Drive toward Mowry Avenue. This area is shown in the overhead map below.



19.     Officer Latimer initiated a pursuit of the suspect vehicles. Officer Trustin Stiers joined the pursuit in a separate patrol car. Two of the five suspect vehicles—a black sedan and a white Honda Accord—turned onto Mowry Avenue in the southwest direction, while three of the five vehicles—a white sedan, a blue Honda Accord, and a white Lexus sedan—turned onto Mowry Avenue in the northeast direction. Officer Latimer elected to pursue the three cars driving in the northeast direction.

20.     Around this time, a sixth vehicle—a black Acura sedan (the "Black Acura" or "Black Acura Sedan")—pulled out of the Kumar Jewelers shopping center and joined the three suspect vehicles Officer Latimer was pursuing. These four suspect vehicles drove northeast on Mowry Avenue, then turned right onto Blacow Road, where they continued driving in a southeast direction. Three of the suspect vehicles—the white sedan, the blue Honda Accord, and the white Lexus sedan—then turned onto Royal Palm Drive, while the Black Acura continued

driving southeast on Blacow Road.  Officer Latimer continued pursuing the Black Acura, which
began splitting traffic and accelerated to around 80 miles per hour while veering between lanes.

21.     The Black Acura then turned onto northbound Boone Drive, where it drove
several blocks through residential streets at speeds reaching 75 miles per hour.  During this time,
the Black Acura passed other vehicles on the left side of the road, ran stop signs at multiple
intersections, and continued onto Logan Drive before eventually turning right onto northbound
Sundale Drive.  At the intersection of Sundale Drive and Fremont Boulevard, the Black Acura
turned left and drove northwest on Fremont Boulevard.  There, it swerved across multiple lanes
before striking a curb on the east side of the road, damaging the right wheel and causing smoke.

22.     The Black Acura continued driving northwest along Fremont Boulevard before
turning onto Walnut Avenue, where it drove northeast on the wrong side of the road before
finally coming to a stop.  Four masked occupants then exited the car and fled on foot.  The below
map depicts the area in which the vehicle was abandoned and the four suspects fled on foot.



23.      Officers Latimer and Stiers exited their patrol cars and ran after one of the four suspects, later identified as Andres PALESTINO, who ran from the Black Acura.  During the foot chase, Officer Stiers yelled to PALESTINO that he would be bitten by a police K9 unless he got onto the ground.  Despite this warning, PALESTINO continued running and entered the parking lot of a nearby U.S. Bank, where he was taken into custody with the assistance of a police K9.  At the time of his arrest, PALESTINO was wearing a black ski mask, a black and gray hooded sweatshirt, black gloves, black pants, and black Jordan XI shoes with white trim.

24.      Around 5:33 p.m., Officer Stiers broadcast that one suspect had been apprehended, but that other suspects fled from the Black Acura on foot.  Additional officers responded to the area where the Black Acura Sedan was abandoned.

25.      Detective Murphy Wilson also responded to the area of Walnut Avenue and Fremont Boulevard with his lights and sirens activated.  He arrived in the area around the same time as Officers Latimer and Stiers.  Detective Wilson observed the Black Acura Sedan stopped on Walnut Avenue, northeast of Fremont Boulevard.  He then saw four suspects exit the Black Acura and begin to flee on foot.

26.      As other officers arrived in the area, Detective Wilson lost sight of one of the four suspects, but witnessed the other three enter a parking lot and run northbound.  He then briefly lost sight of those three suspects as they ran behind a building, then reappeared and entered an underground parking garage located at 39347 California Street.  With his lights and siren still activated, Detective Wilson followed the three suspects into the parking garage and pursued them through the garage until they exited through a pedestrian gate on the garage's south side. The three suspects then ran north through a parking lot along the east side of the parking garage, toward California Street.  Two of the suspects continued running northwest on California Street, toward Beacon Avenue.  Detective Wilson drove alongside the third suspect, later identified as Jose HERRADA-ARAGON, who appeared to be stumbling as he attempted to run.  Detective Wilson exited his vehicle and took HERRADA-ARAGON into custody.  At the time of his

9

arrest, HERRADA-ARAGON was wearing a black hooded sweatshirt with the hood over his head, a full-face mask, dark pants, sunglasses, and black Nike Air Max shoes with gray trim.

27.     Officer Lan Tran and Sergeant Antonio Stillitano also responded to the area of the abandoned Black Acura.  They arrived together in an unmarked police van with its emergency lights activated.  As Officer Tran turned from Walnut Avenue onto California Street, he and Sergeant Stillitano saw a man, later identified as Tom Parker DONEGAN, running on California Steet toward Beacon Avenue, away from the area of the abandoned Black Acura.  DONEGAN was dressed in all black and wearing a black face and head covering.  Both officers exited the police van near the corner of California Street and Beacon Avenue.  Officer Tran chased DONEGAN on foot while Sergeant Stillitano pursued a separate suspect, discussed below.

28.     As DONEGAN rounded the corner onto Beacon Avenue, Officer Tran briefly lost sight of him.  Shortly after, Officer Tran found DONEGAN lying face down between a bush and the wall of a nearby apartment building and placed him under arrest.

29.     Meanwhile, upon exiting the police van, Sergeant Stillitano looked back at the Centre Pointe Plaza, located at the corner of Walnut Avenue and California Street.  There, he saw another man, later identified as Afatupetaiki FAASISILA, running along a sidewalk on California Street.  Around this time, Captain Matt Snelson and Sergeant James Taylor arrived on scene to assist.  Following a short foot pursuit, the officers took FAASISILA into custody.  At the time of his arrest, FAASISILA was wearing a gray hooded sweatshirt, black sweatpants, a black ski mask, sunglasses, white/orange gloves, and white Croc-style shoes.

30.     Officer Jacob Shannon arrived on scene and retraced the suspects' flight paths between the area the Black Acura Sedan was abandoned and the U.S. Bank parking lot.  During this search, he located a total of five gold and diamond bracelets with the price tags still attached: four of the bracelets were found in the U.S. Bank Parking lot, while a fifth bracelet was found in the driveway area between U.S. Bank and a neighboring building.  Based on the amounts listed on the respective price tags, the bracelets had a combined retail value of approximately $48,665.

Detective Adam Vucurevich later showed photographs of the bracelets to RV-1, who identified each bracelet as having come from his store.

31.    Officer Casey Van Galder responded to the area of Walnut Avenue and Fremont Boulevard.  There, he confirmed that there were no additional occupants in the Black Acura Sedan, which he identified as an Acura TLX with California license plate 8WFT577 affixed to the rear.  A records search revealed that the Black Acura Sedan was reported stolen out of Concord, California, on June 17, 2025.  The car's owner reported that there was a Springfield XD 9mm handgun in the trunk at the time the car was stolen.  The records search also indicated that the above-referenced license plate was not assigned to the black Acura sedan.  Officer Van Galder noticed that the vehicle appeared to contain multiple backpacks and dozens of pieces of jewelry, some of which were still attached to display cases.

32.    The Black Acura Sedan was towed to Fremont Police Department.  There, Crime Scene Investigator ("CSI") Kaylee Fitzpatrick searched and processed the vehicle pursuant to a state search warrant.  While searching the Black Acura's passenger compartment, CSI Fitzpatrick located, among other items, numerous pieces of loose jewelry throughout the vehicle, including in the front seat, the backseat, on the center console, and on the floor.  In each of these areas, she also found display boxes containing jewelry.  In the driver's seat, she found a red Under Armour backpack containing jewelry and display cases.  On the front passenger-side floor area, she found a license plate and black masks.  In the rear pocket of the driver's seat, she located additional license plates.  On the passenger-side floor, she found a drill.  In the backseat, she found a pry bar, a black backpack containing jewelry and display boxes, a black ski mask, and a wrench.  Price tags were still attached to many pieces of jewelry found throughout the car.

**Witness Statements**

### *Security Guard ("ND")*

33.    Following the robbery, additional police officers responded to Kumar Jewelers to interview witnesses, process the scene, and collect evidence.  Officer Jaime Alejo arrived at the

store around 6:11 p.m.  There, the Gray Honda Accord was still parked at the store's entrance.
Officer Alejo spoke with the store's security guard, ND.  ND reported that he had been sitting on
a chair outside of the store's front door when he heard a revving engine.  He looked up and saw
the Gray Honda driving toward him.  ND stood up and walked out of the way as the Gray Honda
crashed into the front of store, causing the entrance door to fall.  The Gray Honda then reversed,
and ND saw its occupants exit the car and enter the jewelry store.  He began pressing the panic
button on a device he kept on his person.  ND then saw approximately eight additional vehicles
stop in front of the store and approximately 15 people run into the store.

34.    While pressing the panic button, ND overheard someone say, "Grab him! Grab
him!"  One male suspect ("Unidentified Suspect 1" or "US-1") grabbed ND over his shoulders
while another suspect ("Unidentified Suspect 2" or "US-2") pointed a gun at ND, which ND
described as a black Glock.  US-1 grabbed ND's body and told him, "Get on the fucking ground!
Get on the fucking ground!" while restraining him.  ND laid on the ground before US-1 directed
him to get back up.  US-1 then instructed ND to get back up and proceeded to forcefully pull ND
toward the front of the store.  US-1 looked at ND's waistband and asked him where his gun was.
ND replied that he did not have a gun and told US-1 to let him go.  US-1 continued holding onto
ND before eventually letting go.  ND then saw the robbers enter cars in the parking lot and flee
the scene.  ND said that he felt shocked and a little scared during this incident.

35.    ND described US-1 as a black male in all black clothing with a facemask and
gloves.  He described US-2 as wearing similar clothing and black gloves.  ND said he would be
unable to identify US-1 or US-2 if he saw them again due to their faces being covered.  ND
estimated that three to four minutes elapsed between the time the Honda crashed into the store
and when the suspects fled.

### *Store Owner ("RV-1")*

36.    Officer Kenneth Stange arrived at Kumar Jewelers at approximately 5:52 p.m.
and spoke with the store owner, RV-1.  RV-1 reported that he was in the back of the store when

he heard a loud bang followed by his wife, RV-2, yelling that thieves were there.  RV-1 said that

he and other employees ran to a room in the back of the store, and that they locked the room

while calling 911.  RV-1 stated that he was scared while the incident was taking place, as he saw

five suspects trying to open the door to the store.  He was unable to provide any descriptions of

the suspects.  Once locked in the back room, RV-1 did not see anything else, but did hear sounds

of glass breaking in the store.  RV-1 reported that the total value of the store's inventory prior to

the robbery was approximately $2.3 million dollars.  He estimated that 75% - 80% of this

inventory was stolen during the robbery.

37.     During a subsequent interview with Detective Vucurevich, RV-1 reported that

Kumar Jeweler's inventory had consisted of jewelry he obtained from various distribution

factories.  Some of these distribution factories were in California, and some were in other states.

The raw materials used to create the pieces of jewelry Kumar Jewelers obtained from these

distribution factories were typically imported from foreign countries.  RV-1 estimated that

approximately 95% of Kumar Jewelers' products were sold to customers in California, and that

the remaining products were sold to customers in other states, such as Oregon and Washington.

### Additional Witness ("RV-2")

38.     Officer Stange also spoke with RV-2, who is married to RV-1.  RV-2 said that she

was in the middle of the store when she heard a crashing sound at the front.  She realized that the

store was being robbed and ran to the back of the store with RV-1.  RV-2 said that she was in

fear for her safety during the robbery.  RV-2 stated that she did not see any suspects but was

aware of similar events in the area. While in the back of the store, RV-2 heard glass inside the

store breaking and called 911.

### Store Employee ("PS")

39.     Officer Jeryll Perez arrived at Kumar Jewelers at approximately 6:11 p.m. and

spoke with PS, an employee of the store.  PS said that at approximately 5:30 p.m., she heard a

loud crashing sound from the front of the store and suspected that a vehicle had crashed into the

13

storefront.  Out of concern for her safety, she immediately ran toward the back of the store, where she hid during the robbery.  PS stated that she was in fear for her life and remained hidden during the robbery.  She was unable to provide any suspect descriptions.  After approximately five minutes, PS exited the back room to assess the situation in the showroom.  The glass display cases had been shattered and the jewelry within the store had been stolen.

**Comparison of Surveillance Video Stills and Suspects When Arrested**

40.    RV-1 also met with Officer Raymond Hensly, to whom RV-1 provided surveillance video footage from Kumar Jewelers depicting the store and the parking lot before, during, and immediately after the robbery that occurred on June 18, 2025.

41.    As part of this investigation, I have personally reviewed this surveillance video footage.  I also compared surveillance video still images of various suspects inside and outside of Kumar Jewelers with images of the four individuals who were apprehended after fleeing from the Black Acura Sedan minutes after the robbery.  As discussed below, in reviewing these surveillance videos, I observed who I believe to be Afatupetaiki FAASISILA, Jose HERRADA-ARAGON, and Andres PALESTINO.  The surveillance videos show each of these three men exit the Black Acura, enter Kumar Jewelers, participate in the robbery, then return to the Black Acura, which proceeded to flee the scene.  Additionally, as explained below, from my review of the surveillance video and the facts related to the suspects' flight from police, I believe that Tom Parker DONEGAN was the getaway driver of the Black Acura.

### *Afatupetaiki FAASISILA*

42.    Kumar Jeweler's exterior surveillance video shows the Black Acura Sedan pull up outside the store shortly before the robbery.  FAASISILA exited the front passenger seat of the Black Acura and walked toward the jewelry store's front entrance.  He appeared to be wearing a dark-colored face covering, a gray hooded sweatshirt with a black line across the chest, light-colored gloves, dark pants, and light-colored Croc-style shoes.  He was carrying a dark object that appeared to be a pry bar with a claw end.

14

43.    Kumar Jeweler's interior surveillance video shows FAASISILA enter the store and move toward a glass display counter, from which he removed rectangular-shaped boxes.  At one point, the camera's view of FAASISILA is partially blocked by other suspects.  FAASISILA came back into view and approached another long glass display counter.  As he moved toward the back of the showroom, FAASISILA removed an additional rectangular box from this second display counter.  He then used the pry bar-shaped object to smash the second glass display counter.  FAASISILA removed two additional display boxes from the display counter, then reached over the counter to remove from the wall four display boxes containing jewelry. At this point in the video, the orange palms of FAASISILA's light-colored gloves are visible. FAASISILA then walked back to the front of the store carrying several of the jewelry display boxes, some of which he repeatedly dropped while walking back to the front entrance.

44.    The store's exterior surveillance video captured FAASISILA exit the store and return to the Black Acura, which remained outside.  He then entered the front passenger seat. Shortly after, the Black Acura pulled away.

45.    The following table contains surveillance video screenshots of FAASISILA before, during, and after the robbery, as well as a screenshot from Sergeant Stillitano's body-worn camera ("BWC") video showing FAASISILA at the time of his arrest.

| Exiting Acura | Approaching Store | Inside Store |
|---|---|---|



| Exiting Store | Entering Acura | Arrest |
|:---:|:---:|:---:|
|  | | |

### *Jose HERRADA-ARAGON*

46.     Kumar Jeweler's exterior surveillance video shows HERRADA-ARAGON exit the rear passenger side of the Black Acura and walk toward the store.  He was wearing a dark-colored face covering, a dark hooded sweatshirt, dark gloves with a gray pattern on the back of the hand, dark pants, and dark shoes with gray trim.  He was carrying a dark bag slung in front of his body.

47.     Kumar Jeweler's interior surveillance video shows HERRADA-ARAGON enter the jewelry store and move toward the center of the showroom.  He then turned around and walked back toward the front wall, next to the store's entrance.  There, he reached into the glass display counter.  HERRADA-ARAGON was temporarily blocked from the camera's view by other suspects in the store.  Eventually, he returned to the camera's view and was holding what appears to be one of the jewelry display boxes.  As he made his way back toward the center of the showroom, he reached inside the long display counter, but was again blocked from view by other suspects.  Eventually, HERRADA-ARAGON came back into view and is shown repeatedly reaching into the display counter, from which he removed multiple items that he placed into his dark bag.  He then returned to the front entrance and left the store.

48.     The store's exterior surveillance video shows HERRADA-ARAGON exit the store and return to the Black Acura, which he entered through the rear passenger-side door.

49.    The following table contains surveillance video screenshots of HERRADA-ARAGON before, during, and after the robbery, as well a screenshot from Detective Wilson's BWC video showing HERRADA-ARAGON immediately before his arrest.



| Exiting Acura | Approaching Store | Inside Store |
| Exiting Store | Entering Acura | Arrest |

### *Andres PALESTINO*

50.    Kumar Jeweler's exterior surveillance video captured PALESTINO exiting the rear driver side of the Black Acura and walking toward the store.  He was wearing a dark-colored face covering, a dark hooded sweatshirt with a gray shade on the bottom of the front-side, dark gloves, dark pants, and dark Jordan XI basketball shoes with white trim near the bottom.  On the front of his body, he carried a red backpack with a light-colored Under Armour logo.

17

51.     PALESTINO entered the jewelry store and moved toward the middle of the showroom.  He approached a glass display counter that ran lengthwise from the front area of the showroom to the back.  He repeatedly reached into the display counter and removed items which he placed into the red backpack.  He eventually moved to another display counter and removed a display box.  He then ran toward the store's entrance and returned outside.

52.     The store's exterior surveillance video shows PALESTINO run back to the Black Acura, which he entered through the rear passenger-side door.

53.     The following table contains surveillance video screenshots of PALESTINO before, during, and after the robbery, as well as a screenshot from Officer Stiers's body-worn camera ("BWC") video showing PALESTINO at the time of his arrest.



| Exiting Acura | Approaching Store | Inside Store |
|---|---|---|
| Exiting Store | Entering Acura | Arrest |

### *Tom Parker DONEGAN*

54.    In reviewing the surveillance videos, I did not see anyone inside of Kumar Jewelers during the robbery that I recognized as Tom Parker DONEGAN, nor did I see anyone matching DONEGAN's appearance exit or re-enter the Black Acura Sedan in the parking lot.

55.    The exterior surveillance video shows the Black Acura arrive outside of the store seconds before the robbery.  In the video, at approximately 5:28:01 p.m. (based on the video's timestamp), FAASISILA can be seen exiting the front passenger seat, while HERRADA-ARAGON exits the rear passenger-side seat and PALESTINO exits the backseat on the driver side.  As the three men approach the front of the jewelry store on foot, the surveillance video shows that the driver remained inside the Black Acura, which continued to slowly drive in the parking lot.  While the robbery was occurring inside the store, the external surveillance video shows—from a distance—a person moving about while in the driver's seat of the Black Acura. Around 5:29:09 p.m. (based on the video's timestamp), the three men returned to the Black Acura: FAASISILA entered the front passenger seat, while HERRADA-ARAGON and PALESTINO each entered the backseat on the passenger side.  The driver then drove away.

56.    As described above, while driving away from the scene of the robbery, the Black Acura became involved in the traffic pursuit that continued to Walnut Avenue.  There, the Black Acura's four occupants abandoned the car and attempted to flee on foot before being apprehended by police.  Based on this evidence, I believe that DONEGAN participated in this robbery by serving as a getaway driver for FAASISILA, HERRADA-ARAGON, and PALESTINO.

### **CONCLUSION**

57.    Based on facts set forth in this Affidavit, there is probable cause to believe that on or about June 18, 2025, in Fremont, California, Afatupetaiki FAASISILA, Jose HERRADA-ARAGON, Andres PALESTINO and Tom Parker DONEGAN each violated 18 U.S.C. §§

1951(a) and 2 – Robbery Affecting Interstate Commerce.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

/s/
_____
JASON BRISSEY
Special Agent, Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this 8th  day of December, 2025.

_____
HONORABLE ROBERT M. ILLMAN
United States Magistrate Judge